[Cite as *Demint v. State Med. Bd. of Ohio*, 2016-Ohio-3531.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Franklin Donald Demint, D.O., | : | |
| Appellant-Appellant, | : | No. 15AP-456 |
| | | (C.P.C. No. 14CV-12547) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| State Medical Board of Ohio, | : | |
| Appellee-Appellee. | : | |

D E C I S I O N

Rendered on June 21, 2016

**On brief:** *James R. Kingsley*, for appellant. **Argued:** *James R. Kingsley*.

**On brief:** *Michael DeWine*, Attorney General, *Kyle C. Wilcox*, and *Melinda Snyder*, for appellee. **Argued:** *Henry G. Appel*.

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} Franklin Donald Demint, D.O., appellant, appeals the judgment of the Franklin County Court of Common Pleas affirming an order of appellee, State Medical Board of Ohio ("board"), imposing certain limitations on appellant's certificate to practice medicine and permanently revoking his ability to prescribe narcotic analgesic drugs.

{¶ 2} The following factual background draws from the trial court's decision as well as from the summary of evidence set forth in the report and recommendation issued by a board hearing examiner. Appellant obtained his osteopathic medical degree in 1990. He was certified by the American Osteopathic Board of Family Physicians and by the

American Osteopathic Board of Neuromusculoskeletal Medicine and a diplomate of the American Academy of Pain Management.

{¶ 3}   Appellant currently practices as a solo practitioner in Kingston, Ohio. His practice includes family medicine and addiction medicine, including Suboxone therapy. Appellant testified that between 80 to 90 percent of his current patients are Suboxone patients. He testified he formerly specialized in pain management, but discontinued that specialty when House Bill. No. 93 took effect in 2011.

{¶ 4}   Pursuant to a Step I Agreement, in 2009, appellant's certificate was suspended for at least 180 days based on violations of R.C. 4731.22(B)(5), (10), (20), and (26). The actions constituting the basis for the Step I Agreement were appellant's dependence on marijuana, and his admission of dispensing generic Tylenol 3 tablets to a family member under circumstances that did not constitute an emergency situation while not performing and documenting an examination and without maintaining patient records. Appellant was required to complete 28 days of inpatient treatment, to maintain sobriety, and submit to interim monitoring requirements. Pursuant to a March 2010 Step II Consent Agreement, appellant's certificate was reinstated subject to probationary requirements, including practice monitoring.

{¶ 5}   On March 14, 2012, the board issued a Notice of Opportunity to appellant informing him that the board intended to take disciplinary action against his certificate to practice osteopathic medicine and surgery. The disciplinary action was the result of appellant's treatment of Patients 1-14[1] from March 2010 through April 2011, which the board alleged was below the minimum standard of care and violated the board's rules for utilizing prescription drugs for the treatment of intractable pain. The board alleged that appellant's care of these 14 patients constituted a violation of R.C. 4731.22. Appellant's treatment of these 14 patients fell below the minimal standard of care as follows:

> (a) In regards to Patient 1, you inappropriately prescribed narcotics for treatment of diagnosed fibromyalgia;
>
> (b) In regards to Patients 3-5, 7-8, 11, and 13, you failed to obtain, appropriately review and/or properly document review of patient histories and/or prior medical records;

---

[1] To protect patient confidentiality, the patients and their records are referred to by an assigned number.

(c) In regards to Patients 1-5, and 7-14, the amount and/or type of narcotics prescribed was not supported by history, physical exam and/or test findings;

(d) In regards to Patients 9, and 12, you inappropriately prescribed high doses of narcotics despite diagnoses of underlying Chronic Obstructive Pulmonary Disease.

(e) In regards to Patients 1, 2, 4, 6-10, and 12-14, you failed to develop and/or properly document the development of an individualized treatment plan and/or goals for therapy including, but not limited to, counseling, mental health treatment, selective serotonin reuptake inhibitors [SSRI] and/or physical therapy;

(f) In regards to Patients 1, 2, 5, 9, and 11-14, you failed to obtain toxicology screens prior to prescribing narcotics;

(g) In regards to Patients 3, 6, 8, 9, 11, 12, and 13, you failed to appropriately act and/or properly document appropriate action when presented with signs of patient drug abuse and/or diversion, including early refills and/or multiple abnormal toxicology reports;

(h) In regards to Patients 2-6, 9, and 13, you failed to appropriately evaluate, or document the appropriate evaluation of the patient situation with respect to possible adverse drug effects, signs of any illegal drug and/or alcohol use or abuse, and assessment of quality of patient's home and/or work environment; and

(i) In regards to Patients 1-3, 6, 8, and 12, your medical charting was incomplete, often illegible and/or disorganized.

(State's Ex. 20A at 2-3.)

{¶ 6}  On August 3, 2012, appellant's counsel filed a notice of withdrawal. Appellant's new counsel appeared as counsel of record and requested a continuance on August 16, 2012.  Appellant's counsel requested the continuance to identify and prepare an expert witness, which former counsel failed to do.  The hearing officer denied the request.

{¶ 7}  The hearing officer conducted a three-day hearing and issued a report and recommendation.  The board convened and issued an order on April 18, 2013, finding

appellant inappropriately prescribed controlled medications, failed to maintain minimal standards of care, and failed to employ acceptable scientific methods in the selection of drugs. The order included a six-month to indefinite license suspension and monitoring conditions.

{¶ 8} Appellant appealed and the Franklin County Court of Common Pleas reversed the order of the board and remanded the matter for a new hearing, finding that the hearing officer's denial of the continuance was arbitrary, unreasonable, and contrary to law.

{¶ 9} On remand, appellant submitted the previously proffered testimony of his prior monitoring physician, Dr. Phillip Prior, the affidavit of his current monitoring physician, Dr. Ellis Frazier, Exhibits M-Z, which are summaries of his care of these patients in question, and additional records. The hearing officer issued a report and recommendation on February 13, 2013, recommending the board find appellant violated the standards of practice and violated board rules regarding the prescribing of controlled substances. The board agreed and suspended appellant from the practice of medicine for a minimum of 90 days and permanently revoked his ability to prescribe narcotic analgesic drugs, except buprenorphine-containing products or any other products that are approved to treat drug addiction. At that time of the order, there were four new board members from the time of the first consideration.

{¶ 10} Appellant again appealed to the Franklin County Court of Common Pleas, which affirmed the order of the board. Appellant filed a timely notice of appeal and raised the following assignments of error for our review:

> [1.] WAS IT PREJUDICIAL ERROR TO ALLOW THE TESTIMONY OF DR. CICEK?
>
> [2.] WAS IT PREJUDICIAL ERROR TO FIND THAT DR. DEMINT'S HANDWRITING WAS A BASIS FOR DISCIPLINE?
>
> [3.] WAS THE FINDING OF IMPROPER CHARTING REVERSIBLE ERROR?
>
> [4.] WAS IT PREJUDICIAL ERROR TO FIND THAT DR. DEMINT IMPROPERLY PRESCRIBED NARCOTICS?

[5.] WAS IT PREJUDICIAL ERROR TO FIND THAT DR. DEMINT PRESCRIBED BEFORE RECEIVING INFORMATION WAS RECEIVED OR FAILED TO ACT UPON INCONSISTENT TEST RESULTS?

[6.] WAS IT PREJUDICIAL ERROR TO FIND THAT DR. DEMINT FAILED TO NOTE IN THE FILE THAT HE READ THE FILE EACH TIME HE SAW A PATIENT?

[7.] WAS IT PREJUDICIAL ERROR TO FIND THAT DR. DEMINT TREATED OR FAILED TO DISCHARGE A PATIENT WHO ADMITTED TO ABUSING ILLEGAL DRUGS?

[8.] WAS IT PREJUDICIAL ERROR TO FIND THAT DR. DEMINT IMPROPERLY TREATED FIBROMYALGIA?

[9.] WAS IT PREJUDICIAL ERROR TO FIND THAT DR. DEMINT FAILED TO PROPERLY WARN A COPD PATIENT?

[10.] WAS IT PREJUDICIAL ERROR TO APPLY POST CLAIM STATUTORY CHANGES AND NEWLY ANNOUNCED STANDARDS OF CARE?

[11.] WAS THE BOARD'S DECISION BASED UPON A NEW BOARD MEMBERS' MATERIALLY MISCHARACTERIZED AND INFLAMMATORY EVIDENCE NOT IN THE RECORD?

[12.] DID THE BOARD IMPOSE VINDICTIVE PUNISHMENT?

{¶ 11} The Ohio Revised Code "vests the Board with broad authority to regulate the medical profession in this state, and to discipline any physician whose care constitutes '[a] departure from, or the failure to conform to, minimal standards of care of similar practitioners under the same or similar circumstances, whether or not actual injury to a patient is established.' " *Griffin v. State Med. Bd.*, 10th Dist. No. 09AP-276, 2009-Ohio-4849, ¶ 3, quoting R.C. 4731.22(B)(6). In an appeal from an order of the board, "a reviewing trial court is bound to uphold the order if it is supported by reliable, probative, and substantial evidence, and is in accordance with law." *Pons v. State Med. Bd.*, 66 Ohio St.3d 619, 621 (1993), citing R.C. 119.12. " 'Reliable' evidence is dependable; that is, it can

be confidently trusted. In order to be reliable, there must be a reasonable probability that the evidence is true." *Our Place, Inc. v. Ohio Liquor Control Comm.*, 63 Ohio St.3d 570, 571 (1992). " 'Probative' evidence is evidence that tends to prove the issue in question; it must be relevant in determining the issue." *Id.* " 'Substantial' evidence is evidence with some weight; it must have importance and value." *Id.*

{¶ 12} The common pleas court's " ' "review of the administrative record is neither a trial *de novo* nor an appeal on questions of law only, but a hybrid review in which the court 'must appraise all [the] evidence as to the credibility of the witnesses, the probative character of the evidence, and the weight [thereof].' " ' " *Temponeras v. Ohio State Med. Bd.*, 10th Dist. No. 14AP-970, 2015-Ohio-3043, ¶ 8, quoting *Akron v. Ohio Dept. of Ins.*, 10th Dist. No. 13AP-473, 2014-Ohio-96, ¶ 19, quoting *Lies v. Ohio Veterinary Med. Bd.*, 2 Ohio App.3d 204, 207 (1st Dist.1981), quoting *Andrews v. Bd. of Liquor Control*, 164 Ohio St. 275, 280 (1955). When there is conflicting testimony, the court must give due deference to the administrative determination of conflicting testimony, including resolution of credibility conflicts. *Temponeras* at ¶ 8, citing *Crumpler v. State Bd. of Edn.*, 71 Ohio App.3d 526, 528 (10th Dist.1991). Unless the findings of fact are " ' "internally inconsistent, impeached by evidence of a prior inconsistent statement, rest upon improper inferences, or are otherwise unsupportable," ' " the court must defer to such findings by the agency. *Id.* at ¶ 8, quoting *Kimbro v. Ohio Dept. of Adm. Servs.*, 10th Dist. No. 12AP-1053, 2013-Ohio-2519, ¶ 7, quoting *Ohio Historical Soc. v. State Emp. Relations Bd.*, 66 Ohio St.3d 466, 471 (1993). The common pleas court reviews legal questions de novo. *Id.*

{¶ 13} An appellate court's review "is even more limited than that of the trial court." *Pons* at 621. Specifically, "[w]hile it is incumbent on the trial court to examine the evidence, this is not a function of the appellate court. The appellate court is to determine only if the trial court has abused its discretion, *i.e.*, being not merely an error of judgment, but perversity of will, passion, prejudice, partiality, or moral delinquency." *Id.* Thus, "[a]bsent an abuse of discretion on the part of the trial court, a court of appeals may not substitute its judgment for those of the medical board or a trial court." *Id.* An appellate court's review is plenary when it is determining whether the board's order was in accordance with law. *Temponeras* at ¶ 9, citing *Weiss v. State Med. Bd. of Ohio*, 10th

Dist. No. 13AP-281, 2013-Ohio-4215, ¶ 15, citing *Univ. Hosp., Univ. of Cincinnati College of Medicine v. State Emp. Relations Bd.*, 63 Ohio St.3d 339, 343 (1992).

{¶ 14} In his first assignment of error, appellant contends that it was prejudicial error to allow the testimony of the state's expert witness, Dr. Wendy Cicek. The trial court found the record contained ample evidence establishing Dr. Cicek's expertise in treating patients with chronic pain.

{¶ 15} Dr. Cicek is an assistant professor and former clinical instructor at Case Medical School. She is board certified by the American Board of Family Medicine. Until a few weeks prior to the hearing, she was employed at MetroHealth Medical Center ("MetroHealth") where she was practicing when she reviewed the records for this case. However, just weeks before the hearing, she started working at Kaiser Permanente. At MetroHealth, she worked as a family physician with five other providers, providing primary care to patients. She averaged approximately 25 patients per day and utilized controlled prescription narcotics in her practice. Approximately 30 to 40 percent of her patients included ones with chronic pain, many of them utilizing opioid medications. Ninety percent of her practice prior to her recent job change was clinical work and currently 100 percent is clinical work. She received CME training in pain management. When she worked at MetroHealth, she had a DEA certification to prescribe Suboxone. Dr. Cicek reviewed the 14 patient records and prepared a report regarding her findings.

{¶ 16} Although the board is not required to present expert testimony to support the charges against a physician, reliable, probative, and substantial evidence must support the charges. *Griffin* at ¶ 13. This court has set forth that an expert may testify in a medical board proceeding if the expert's experience and practice is similar to the physician facing discipline. *Leak v. State Med. Bd.*, 10th Dist. No. 09AP-1215, 2011-Ohio-2483, ¶ 12. "[T]he expert must be capable of expressing an opinion grounded in the particular standard of care applicable to the area of practice for the physician facing discipline." *Id.*, citing *Lawrence v. State Med. Bd. of Ohio*, 10th Dist. No. 92AP-1018 (Mar. 11, 1993).

{¶ 17} Appellant is board certified in family medicine and, similar to Dr. Cicek, he received his training in pain management through CME. His practice includes family medicine and addiction medicine, including Suboxone therapy. Dr. Cicek's training,

clinical practice, and experience is similar to appellant's practice and the record supports that she has expertise in treating patients with chronic pain.

{¶ 18} Moreover, given that the board is comprised of individuals who are trained medical professionals, the board may rely on its own expertise to determine whether a physician failed to conform to minimum standards of care. *Arlen v. Ohio State Med. Bd.*, 61 Ohio St.2d 168, 172 (1980). The *Arlen* court further explained, at 174, as follows:

> The requirement for expert testimony in the record of a license revocation proceeding usurps the power of the State Medical Board's broad measure of discretion. The very purpose for having such a specialized technical board would be negated by mandating that expert testimony be presented. Expert opinion testimony can be presented in a medical board proceeding, but the board is not required to reach the same conclusion as the expert witness. The weight to be given to such expert opinion testimony depends upon the board's estimate as to the propriety and reasonableness, but such testimony is not binding upon such an experienced and professional board.

{¶ 19} Further, appellant argues that Dr. Cicek was not credible. As stated, the common pleas court in its review must give due deference to the administrative resolution of evidentiary conflicts. *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 111 (1980). We cannot find fault with the trial court for refusing to substitute its judgment for the board's judgment. Appellant's first assignment of error is overruled.

{¶ 20} Many of appellant's other assignments of error contest whether the board properly concluded that he failed to meet the standard of care in various ways. A review of Dr. Cicek's report, as the state's expert, is appropriate to determine whether the trial court abused its discretion in finding there was reliable, probative, and substantial evidence in the record and that the decision was in accordance with law.

{¶ 21} Dr. Cicek's report reviewed each of the 14 patient's records and concluded, as follows:

> [Patient 1:]
>
> Although the notes were VERY difficult to read due to illegible handwriting, there did not appear to be a notation of where the patient was receiving treatment during her absence from Dr. DeMint's practice.

\* \* \*

[T]he initial exam was essentially normal and there was no reference to prior therapies attempted or to tests on file. An [Ohio Automated Rx Reporting System] report was completed when he assumed care however no urine toxicology was done.

At the initial visit, narcotic medication was prescribed, along with cyclobenzaprine and ibuprofen. The physical exam and test findings did not support the level of pain described or the medications used. There were no goals of therapy or plan for trying different medications (ie appropriate medication for Fibromyalgia). There were no referrals for Physical Therapy or other non-medication therapies. Narcotics are specifically NOT recommended for fibromyalgia. All of the above deviate from the standard of care.

In my opinion, the care instituted did depart from the minimal standard of care that would be provided by similar practitioners and a failure to employ acceptable scientific methods in drug selection occurred. No obvious patient harm occurred. The patient notes were often illegible, which is also not acceptable patient care, specifically in the setting of pain management.

[Patient 2]

Her initial visit with Dr. DeMint was 8/20/10 at which time there is no note of a narcotic contract, no toxicology screen, and no written review of previous tests. In notes, he states she is returning from a different provider due to dissatisfaction with the previous provider's care. At her initial visit, the patient was prescribed oxycodone and Oxycontin (patient stated that Oxycontin had worked for her in the past). There were multiple mentions of anxiety and depression and significant life/home stressors and Dr. DeMint appropriately referred her to a psychiatrist in October 2010 after trying a few different antidepressants. The patient never followed through with this referral due to "problems with insurance."

The documentation for this patient was often difficult to read and information was scant. Physical exams were not consistent with the subjective level of disability. The patient's severe anxiety and depression did not appear to have been

well treated, as there were constant complaints of this through the record. Treating her anxiety and depression appropriately and utilizing the expertise of a psychiatrist would likely have aided in her pain management. The medication used to manage her chronic anxiety was not ideal. The amount of narcotic the patient received was not supported by her clinical findings (exam and tests). This demonstrates a departure from minimal standards of care that would be employed by similar practitioners.

[Patient 3]

There is no note of review of previous records/radiology received from the ED, nor is there any note regarding the urine toxicology results. It remains unclear where the patient obtained Valium.

There are several concerns in the care of this patient. Sloppy records, including lack of co-signatures on narcotic contracts, incorrect dates on forms and urine tests that do not correlate with the patient's prescriptions. The patient received a large number of oxycodone at his initial visit prior to any record review. He was not brought back for one month. When the patient had buprenorphine in his urine and lacked oxycodone and did not appear to be in opiate withdrawal, he was given his normal prescriptions.

This care does not meet minimal standards of care for similar practitioners and the medication doses and amounts are not supported by radiologic findings. (the CT of the lumbar spine in 9/10 is essentially normal). The documentation is insufficient to support the medication choices and red flags are not addressed, showing failure to employ scientific methods in drug selection/treatment.

[Patient 4]

Concerns regarding this patient include the incomplete past medical history (hepatitis B), personal and family drug history and high dose narcotics with minimal findings on lumbar spine MRI and lumbar spine exam. The patient did have some findings on thoracic spine MRI but physical exam findings were essentially normal with the exception of decreased shoulder abduction. The patient was referred to physical therapy at the last note in April 2011 and this is the first time previous PT was noted.

The minimal standards of care were not met in regards to documentation of need for high dose narcotics; other standard therapies for pain and anxiety were not documented and the choice of medication was excessive considering the radiologic findings. The patient has Hepatitis B which raises the question of previous IV drug use and a chaotic home environment was mentioned which is a less than ideal situation for using large amounts of and high dose narcotics.

[Patient 5]

The initial visit documentation is vague, mentioning an ankle surgery and "knee fracture" but no dates, details or previous therapies are addressed in this note. There is no active problem list in the chart and the initial history and physical form in the chart (2004) is incomplete.

* * *

The patient had been on high dose narcotics prior to Dr. DeMint's assumption of his care. A more thorough review of his previous history may have supported the high dose narcotics, however, the amount of medication appears to be excessive for what is documented in the chart (by subjective findings, physical exam and previous tests). Lack of an OARRS search and urine toxicology at the time Dr. DeMint assumed the patient's care is also not consistent with standard practice.

Deviations from the minimal standard of care include insufficient chart notes to support chosen medications, large amounts of Valium in a person working as a carpenter and who drinks and insufficient physical findings to support the amount of medication prescribed.

[Patient 6]

The initial exam is essentially a "fill in the blank" form and mentions decreased lumbar spine ROM and decreased sensation on right but unable to read what area of the body due to illegible handwriting.

* * *

Pain medication for this patient is not inappropriate but there are concerns.  His urine toxicology was inappropriately

negative for oxycodone, he had consistently high levels of pain but mentions fishing and camping as activities, and he is receiving no mental health care with the exception of daily benzodiazepines. It is not clear how the inappropriate toxicology tests were addressed. It was also not clear the patient was progressing toward any goals.

This patient's care deviated from minimal standards as evidenced by the lack of follow through on inappropriate toxicology screens and continued prescriptions for narcotics. The choice of medication for the patient's anxiety also deviates from standards of care reflected by the dose and amount prescribed as well as duration of use. The medical record is illegible in places and very difficult to read which is inappropriate for a patient receiving this type of treatment (covering providers need to be able to read the chart).

[Patient 7]

Issues of concern regarding this patient's care include his receipt of a month supply of Xanax and Percocet 10/325 with a minimal physical exam and undocumented history. A more prudent approach would have been to give the patient a 1-2 week supply of medication and require him to return with documentation of prior care and prior therapy, including specialist consult reports and PT reports. The documented physical exam did not support this amount of medication. There was no note of the patient receiving any other therapy for his anxiety, ie counseling or SSRI medication. (old records indicate patient was hospitalized in July 2010 for suicidal ideation)

The patient was promptly and appropriately discharged when it was found that he was receiving prescriptions from other providers, however, this patient's initial treatment deviated from minimal standards of care as evidenced by a physical exam that does not support the amount of medication he was given and lack of records/information to support such a large amount of medication.

[Patient 8]

She had a brief history including prior medications but no note of previous non-medicine therapies. * * * The physical exam was brief and the only noted abnormality was decreased range of motion in the lumbosacral spine "in all planes".

Approximately 40 to 50% of the notes are illegible and it is unclear from the chart if the patient was seen in this clinic previously. (It appears she was treated for a Worker's Comp claim in 2008/9.) The chart was somewhat disorganized as well with no legible reference to the prior Worker's Comp care.

* * *

There are several concerns regarding this patient's care. She is given a substantially larger dose of narcotic at her first visit than she had been receiving from her previous provider. Her documented physical exam does not support the amount of narcotic prescribed. There is mention of patient having a problem with the previous provider which is not investigated prior to her one month prescription. No urine toxicology is sent at her first visit. When the patient complains of feeling stressed, she is given #90 Xanax and not referred for any behavioral therapy. The more logical approach would be to provide a small number of benzodiazepines while the SSRI is taking effect. There was no history documented regarding prior evaluation or treatment for anxiety or depression. I was unable to locate any notes from Dr. DeMint regarding documentation supporting her prior back surgeries or radiology tests.

This departed from minimal standards in several areas noted above. The selection of medications/amount of medication was not appropriate. Appropriate non-medication therapies were not explored for the patient's skeletal pain and anxiety. The physical exam did not support the level of the patient's pain or amount of medication prescribed. The notes were often difficult to read/interpret.

[Patient 9]

Concerns regarding this patient's care include his receiving a month of medicine despite the note he was discharged from another provider, no urine drug screen at initial visit and 3 more urine drug screens which had at least one inconsistent value. This patient also appeared to have fairly severe COPD (noted to be on oxygen) and was taking very large doses of drugs that depress the respiratory center in the brain. There was no family history documented re: drugs/etoh and later in the chart it is noted that the patient had 3 relatives staying with him who were on Suboxone.

The medication selection and treatment deviated from minimal standards for similar providers as evidenced by high doses of narcotics with minimal objective findings (exam and radiology) and continued prescriptions with inconsistent toxicology screens. The medications used to treat this patient's anxiety (Alprazolem) is not the appropriate first line of therapy.

[Patient 10]

The patient was on high doses of narcotics for his MRI finding (both oxycodone and tramadol). His physical exam was normal at all visits, including reflexes and lower extremity strength. There was no note of a positive straight leg raise test.

This patient's care deviated from minimal standards in regards to the amount of narcotic medication he was prescribed (high doses and large amounts) considering an essentially normal physical exam. The care also deviated from what is considered typical care, a regular non-steroidal anti-inflammatory with either gabapentin or Lyrica and a small amount of narcotic pain medication for exacerbations.

[Patient 11]

This patient was being treated for chronic low back pain, DDD and depression. His MRI findings were not consistent with his pain complaint. A urine toxicology sent 9/9/10 was positive for THC, hydrocodone (which the patient stated he was allergic to) and benzodiazepine. These were all inconsistent with his prescribed medication.

It would not be in the best interest of a patient to provide a one month prescription of narcotic when there is a question of previous drug abuse. The patient's history of an inconsistent urine toxicology is not noted in the chart at this initial visit although it appears that they were available. A more thorough evaluation of this patient's history should have been completed and at the very least, he should only have been given one week of medicine pending review of old records. Physical exam notes are difficult to read and minimal at most visits, with the exception of right SI joint pain. This patient's care does not meet the minimal standards of care expected in regards to the choice and amount of medication prescribed related to the patient's

radiologic findings and physical exam. There is also a departure from the minimal standard of care as compared to the care of similar practitioners as evidenced by the initial prescription in light of a clear history of illicit drug use.

[Patient 12]

On the patient's initial visit with Dr. Demint, there is no note of a chart review, there is a brief past medical history, past surgical history and social history where it is noted "no drugs". * * * There is no indication of previous treatment (ie counseling, non-controlled drugs) for this patient's anxiety, nor is any indication of review of prior therapies for pain or prior imaging. Several of the notes are illegible.

* * *

There is also no indication that this patient has had any appropriate counseling, non-narcotic drug trial or other therapy for his anxiety and there is no discussion of the effect of marijuana on his anxiety and other medications. This patient is noted to have COPD which is called moderate to severe on chest x-ray and is on high doses of medications which are known to depress the respiratory drive.

This patient's care departs from minimal standards in several ways, including prescribing narcotics and anxiolytics to a known illicit drug user and prescribing high doses of narcotics to someone with underlying COPD. The office notes are poorly organized and it is difficult to determine the extent of the patient's physical findings without going through extensive old records. This is another example of deviation from minimal standards of care. The medications used also do not meet minimal standards as suggested by using benzodiazepines for anxiety in an illicit drug user and not trying non-controlled options or psychotherapy first.

[Patient 13]

There was no active problem list in the chart, no initial history and physical and basically little to no past med history. Dr. Demint's initial note in March 2010 is brief, does not address previous care, tests or treatment.

* * *

The physical exams did not support the patient's pain level. Previous radiology included MRIs of the lumbar spine and ankle, both with some abnormalities, however they do not support the high dose of narcotic the patient was receiving (30 mg oxycodone #120/mo). The patient's depression did not appear to be adequately treated and it was unclear if she was receiving counseling. Her undertreated depression likely increased her pain perception.

In general, the documentation for this patient did not support the amount of medication she was receiving and despite requiring an early refill in 4/10, urine toxicology screens were not done until October 2010. OARRS reports and ancillary therapies were not documented in her notes. The absence of these measures deviates from the minimal standard of care. The large amounts of high doses of narcotic do not meet minimal standards for appropriate medication choice in this patient at high risk for narcotic addiction/abuse.

[Patient 14]

At the time of transfer of care, there was no urine toxicology screen, no OARRS report and very brief HPI and physical exam. The chart has a large amount of old records, including information regarding discharge from a previous pain clinic for a failed urine toxicology and an evaluation by an independent examiner expressing concern regarding this patient's high dosage of controlled medications in the situation of an essentially normal physical exam.

Throughout his course of care, the patient seemed to need continually higher doses of narcotic medication and did not tolerate for various reasons, non-controlled drugs which are indicated for neuropathic pain.

* * *

Office notes are difficult to read due to illegible handwriting, however, improvements in function are not noted and physical exams, which are brief, are normal.

This patient's care did not meet the minimal care standards. Deviations of standard of care include continually escalating doses of narcotic medication when they do not seem to be improving pain or function as well as not sending a urine toxicology at the time of assuming the patient's care. (he was

discharged from a previous physician for a failed toxicology screen). There was no summary of the plan to date when Dr. Demint assumed care and no measure of improvement in function. Also, of concern, is the patient's inability to tolerate gabapentin or Lyrica, both indicated for neuropathic pain. The patient is only able to tolerate Soma which is metabolized to a barbiturate. This was never addressed with the patient or mentioned in the assessment and plan. The patient does not receive any psychological referral or counseling which is clearly indicated. The doses and amounts of medication the patient received are excessive compared to the physical exam and radiology findings. Lastly, consulting physicians comment on the high doses of narcotics and near normal physical exam, this is not addressed by Dr. Demint.

(Emphasis sic.; State's Ex. 16.)

{¶ 22} By his second, third, and sixth assignments of error, appellant argues that the board improperly disciplined him for poor handwriting, inadequate charting of the treatment of his patients, and failure to document in the file that he reviewed the file each time he did so. The board found that appellant's medical charting for Patients 3, 6, 8, and 12 was incomplete, often illegible and/or disorganized.

{¶ 23} In addition to her written report, Dr. Cicek testified at the hearing regarding her concerns with the care given to each of these patients. As to Patient 3, she stated she had "a lot of trouble reading the notes [due to the handwriting]." (Tr. Vol. II at 363.) Dr. Cicek found that there was no documented reason for increasing the patient's narcotics and appellant did not document that he had reviewed the previous records. Dr. Cicek testified regarding Patient 6 that appellant did not document the goals or expectations for the patient's treatment and that violates the board's rules because a practitioner must develop an individualized treatment plan. The records do not indicate the reason for the prescriptions. The record does not properly reflect how appellant addressed the inconsistency of the toxicology screens with the patient and the follow-up with the patient. Dr. Cicek stated Patient 6's record fell below the standard of care because there was no documentation as to the follow through on the toxicology screens, the lack of individualized treatment plans, and the legibility.

{¶ 24} Dr. Cicek testified that Patient 8 received a higher dose of narcotics at the initial visit with appellant, but no documentation as to the rationale. The assessment or plan does not address the increase in medication. Appellant did not document that he reviewed the prior records. There is no individualized treatment plan. Dr. Cicek stated the overall charting fell below the standard of care.

{¶ 25} Regarding Patient 12, Dr. Cicek testified that appellant failed to record in the record any review of attempted modalities of pain management, any review of the patient's current level of function or functional goals, and any individualized treatment plan. Appellant's notes were "poorly organized and it was difficult to determine the extent of the patient's physical findings without going through extensive old records." (Tr. Vol. II at 449.) Parts of the record were illegible.

{¶ 26} Appellant argues that Dr. Ellis Frazier found his records were substantially legible. Dr. Frazier also stated that a physician is not required to note in the patient file at each consultation that the physician reviewed the file. Further, Dr. Frazier stated that a physician is not required to state what each prescribed drug is intended to treat as long as the entire record shows a specific diagnosis and that the prescribed drug is a known treatment for the diagnosis. Dr. Frazier believed appellant appropriately documented evaluations, diagnoses, and treatment plans.

{¶ 27} Board member Dr. Steinbergh found that appellant's "medical records lacked a great deal of information." (Board's Ex. D at 5.) Dr. Steinbergh stated that "one of the reasons medical records are kept is so that any practitioner can follow the physician's thought process and treatment plan." (Board's Ex. D at 5.) At that board meeting, Dr. Steinbergh noted that Dr. Prior testified at the hearing that, in his opinion, appellant's records demonstrated minimal standards.

{¶ 28} Moreover, appellant focused his arguments on specifics, such as his argument that handwriting cannot be the basis of discipline. However, the board found more here than illegible handwriting. The board found both his medical documentation and charting were incomplete and not thorough, disorganized, illegible, and lacking necessary medical information. Despite appellant's evidence supporting his position, the record is replete with evidence supporting the board's determinations. The trial court determined that it could not substitute its opinion as to proper and adequate charting for

the opinion of the experts that serve on the board. The record contains evidence constituting substantial, reliable, and probative evidence. We cannot find that the trial court abused its discretion in so finding. Appellant's second, third, and sixth assignments of error are overruled.

{¶ 29}   In his fourth assignment of error, appellant contends the board erred in finding that he improperly prescribed narcotics. Appellant argues that the board improperly found that he prescribed large doses of opioids because the doses he prescribed were "in the box." Since appellant prescribed a dose below the 180 milligram per day morphine equivalent, he contends that he did not prescribe a dose that was too high.

{¶ 30} Appellant testified that "in the box" refers to practices that are commonly accepted and "out of the box" refers to uncommon practices, pursuant to an article from medscape.org. (Tr. Vol. III at 671.) The article references opiate doses in the moderate range of 180 milligrams morphine equivalent per day. Thus, appellant argues that he prescribed doses that were "within the box" and, thus, the board cannot discipline him on that basis.

{¶ 31} However, Dr. Cicek focused on more than the amount of drugs prescribed. Her testimony focused on the fact that the type and amount of narcotics was inappropriate given the patient's history, assessment, and the medical judgment employed based on the presentation of these patients. For example, regarding Patient 1, Dr. Cicek testified that 30 milligrams of hydrocodone per day that appellant prescribed at the patient's first visit was excessive. The physical examination documented by appellant did not support that medication dosage. Dr. Cicek testified that Norco 10/325 is stronger than Vicodin and the record was not clear for what diagnoses appellant prescribed the Norco. Dr. Cicek testified that appellant inappropriately prescribed narcotics for Patient 1's fibromyalgia.

{¶ 32} Regarding Patients 1 through 5, and 7 through 14, Dr. Cicek testified that appellant failed to document a physical examination. Dr. Cicek testified there was a lack of physical examination findings documented to support the level of narcotics prescribed. She noted that the examinations were incomplete, minimal, or not documented at all. Dr. Cicek testified that a family physician's chart should include the following:

[A]n initial visit with a primary care provider, a family physician, typically reviews the patient's past medical history, past surgical history, family history, and social history.  If they are coming in for a specific problem, the previous treatment of that problem and how the problem responded to that treatment.  The current medications the patient's taking, their current allergies, and what their current complaints are.

And, again, if we're talking about a situation where they're complaining of chronic pain, how that pain's limiting their function, their ability to proceed or, you know, live a productive life.

And then a thorough physical exam.  Often a review of systems if something's not addressed in what we call the HPI, the history of the present illness.  A review of systems, a physical exam, and then an assessment and plan.  And your assessment isn't simply a diagnosis; it's your thought process behind what leads you to that particular diagnosis.

(Tr. Vol. II at 354-55.)

{¶ 33} Dr. Cicek testified that regarding Patient 1, she found the dose of hydrocodone per day that appellant prescribed at the first visit was excessive and the physical examination documented at that first visit does not support that dose of medication.

{¶ 34} Moreover, regarding Patient 2, Dr. Cicek testified that the physical findings appellant documented did not support the amount of controlled substance medication he prescribed.  Dr. Cicek testified that the documentation of the physical examination was only "MS full ROM LS spine" and that documentation was lacking because a "musculoskeletal exam encompasses more than range of motion of the lumbosacral spine. It encompasses reflex testing, strength, sensation, range of motion, muscle asymmetry or atrophy."  (Tr. Vol. II at 357-58.)

{¶ 35} Dr. Cicek testified similarly for Patients 3 through 5 and 7 through 14, that the history and physical examination findings documented did not support the amount of narcotics prescribed.  She consistently found that appellant should have determined whether the patients were proper candidates for narcotics or should have been treated with other non-narcotic methods.

{¶ 36} Appellant argues that the board and the trial court failed to distinguish *In re Williams*, 60 Ohio St.3d 85 (1991). Appellant contends that *Williams* holds that with the facts of this case, the board could not rely on its own expertise. However, the facts of this case are distinguishable from the facts in *Williams*. In *Williams*, the Supreme Court of Ohio found that the board has "broad discretion to resolve evidentiary conflicts * * * and determine the weight to be given expert testimony." *Id.* at 87. In that case, the doctor dispensed controlled substances in a legally permitted manner but in a manner disfavored by the medical community. The only evidence in the record was the expert testimony that the practice of Dr. Williams did not fall below the acceptable standard of medical practice. The board then disagreed with the expert. The Supreme Court determined that the board cannot convert its disagreement with an expert's opinion into affirmative evidence of the opposite position where the issue is one on which medical experts are divided and there is no statute or rule governing the issue. This case differs from the one in *Williams*, however, because here there was expert opinion evidence submitted on both sides of the issue. The board did not simply choose the opposite position of appellant, but, rather, the board chose an expert opinion other than appellant's expert's opinion. The record contains evidence supporting the board's position.

{¶ 37} Given this evidence in Dr. Cicek's report and testimony, the trial court did not abuse its discretion in finding that the record contains evidence constituting substantial, reliable, and probative evidence. Appellant's fourth assignment of error is overruled.

{¶ 38} In his fifth assignment of error, appellant contends the board erred in finding that he prescribed narcotics before receiving information and failed to act on inconsistent test results.

{¶ 39} The hearing officer found the evidence was insufficient to support a finding that appellant practiced below the minimal standard of care by failing to obtain toxicology screens prior to prescribing narcotics to Patients 2, 5, 9, and 11 through 14. The evidence establishes that appellant did obtain an in-house urine screen on Patient 1 at her initial visit. The hearing officer found that appellant's assertion that the standard of care does not require a physician to obtain an initial drug screen prior to prescribing narcotics was persuasive and found the evidence insufficient to support a finding that appellant

practiced below the minimal standard of care. The board did not amend this finding. Thus, the first contention in appellant's fifth assignment of error is overruled.

{¶ 40} Appellant also contends the board erred in finding that he failed to act on inconsistent test results. Appellant contends that he did act on inconsistent test results. However, he continued to prescribe a one-month supply of narcotics for months before he acted on the inconsistent test results. Dr. Cicek testified that although urine screens should be verified because of the possibility of false positives, a cautious approach to further treatment is necessary after an inconsistent result. She testified that a one to two-week supply of narcotics should be prescribed rather than an entire month. The medication should be changed in amount or number of pills prescribed. The patient should be more closely monitored. Given this evidence, appellant's fifth assignment of error is overruled.

{¶ 41} In his seventh assignment of error, appellant contends the trial court erred in finding there was substantial, reliable, and probative evidence that appellant treated or failed to discharge a patient who admitted to abusing illegal drugs. Patient 12 admitted using marijuana after a urine screen tested positive. Appellant discussed that marijuana was illegal in Ohio with the patient, but appellant admitted he continued to prescribe controlled substances to the patient for months.

{¶ 42} Appellant further contends in his argument section in this assignment of error that he disagrees with Dr. Cicek's opinion that when a patient admits to drinking six beers in a weekend, that the patient must be counseled not to mix alcohol and narcotics. Appellant claims he can rely on the warning from the pharmacist.

{¶ 43} Dr. Cicek testified under circumstances that indicate drug abuse, especially illegal drugs, that the provider should discharge the patient. When a urine sample indicates the patient is using drugs that were not prescribed or not using drugs that were prescribed, at a minimum, the provider must limit prescribing to ten days to two weeks worth of medication and then re-evaluate the patient after confirmation of the laboratory results. Appellant continued prescribing a one-month supply. Given this evidence in Dr. Cicek's report and testimony, the trial court did not abuse its discretion in finding that the record contains evidence constituting substantial, reliable, and probative evidence. Appellant's seventh assignment of error is overruled.

{¶ 44} In his eighth assignment of error, appellant contends that it was prejudicial error to find that he improperly treated fibromyalgia.  Appellant diagnosed Patient 1 with a degenerative disk disease of the lumbar spine, fibromyalgia, tendonitis, bunion, and skin lesion. Appellant testified he prescribed Norco, not just for the patient's fibromyalgia, but also as treatment for her overall pain.

{¶ 45} Dr. Cicek's report specified that prescribing narcotics for fibromyalgia deviated from the standard of care.  Dr. Cicek also testified:

> Fibromyalgia is a constellation of symptoms that is -- has no appreciable objective test besides pressure points to make the diagnosis. Often it's a diagnosis of exclusion when people have a pain syndrome often complicated by a mood disorder, fatigue.

(Tr. Vol. II at 344.)

{¶ 46} Dr. Cicek continued and stated that narcotics are not appropriate for fibromyalgia "because there are classes of drugs that are appropriate and have been proven to actually improve function in fibromyalgia," including Lyrica and Cymbalta.  (Tr. Vol. II at 345.)  Dr. Cicek testified that the physical examination documented by appellant did not support the level of medication he prescribed.

{¶ 47} Moreover, appellant submitted evidence on remand that supported the finding that it is not appropriate to treat fibromyalgia with an opioid.  The formerly proffered testimony of Dr. Prior provided that it was not appropriate to do so.  Appellant also submitted an article published in the September 2013 issue of The Journal of the American Osteopathic Association, *Fibromyalgia:  A Clinical Update*, in which the author writes that opioids have not been demonstrated as effective in the management of fibromyalgia and should be avoided.

{¶ 48} Appellant further argues that the hearing officer found appellant improperly prescribed narcotics for the treatment of fibromyalgia and this finding must be reversed due to a fatal variance.  Appellant contends that the charge was inappropriately prescribing narcotics for fibromyalgia but the finding was an improper diagnosis for fibromyalgia.  A fatal variance occurs where the allegations and the evidence do not correspond.  *James Reynolds & Co. v. Morris*, 7 Ohio St. 310 (1857).  While appellant is correct that the board discussed the methodology of his diagnosing Patient 1's

fibromyalgia, the finding was not that he had misdiagnosed the patient, but, rather, he prescribed narcotics for a condition that narcotics were inappropriate to treat. Thus, given this evidence, the trial court did not abuse its discretion in finding that the record contains evidence constituting substantial, reliable, and probative evidence. Appellant's eighth assignment of error is overruled.

{¶ 49} In his ninth assignment of error, appellant contends that it was prejudicial error for the board to find that he failed to warn a Chronic Obstructive Pulmonary Disease ("COPD") patient properly of the dangers of narcotics and oxygen. Appellant again argues that a fatal variance exists because the board focuses on prescribing these medications and not the documentation of the discussion of the risks with the patient.

{¶ 50} However, the finding by the board was that appellant fell below the standard of care by prescribing high doses of narcotics to Patients 9 and 12, both of whom had COPD, without properly documenting the proper patient consultation. In her report, Dr. Cicek stated, "[Patient 9] also appeared to have fairly severe COPD (noted to be on oxygen) and was taking very large doses of drugs that depress the respiratory center in the brain." (State's Ex. 16 at 9.) Regarding Patient 12, Dr. Cicek noted, "This patient is noted to have COPD which is called moderate to severe on chest x-ray and is on high doses of medications which are known to depress the respiratory drive. This patient's care departs from minimal standards in several ways, including prescribing narcotics and anxiolytics to a known illicit drug user and prescribing high doses of narcotics to someone with underlying COPD." (State's Ex. 16 at 11.)

{¶ 51} Further, in her testimony, Dr. Cicek testified that it was below the standard of care to prescribe such a high dose of narcotics on the first visit. "And the last time the patient had received a long-acting opioid was * * * four months prior to the visit where he's given OxyContin 60 and 120 high-dose Percocets. So to go from nothing to that in a patient with COPD severe enough to require oxygen is very concerning" and below the standard of care. (Tr. Vol. II at 424-25.) She expressed the same concern regarding high-dose narcotics in a patient with an underlying lung dysfunction for Patient 12.

{¶ 52} The minutes of the November 5, 2014 meeting indicate that when discussing Patient 9, who had been prescribed OxyContin and oxycodone by appellant, Dr. Ramprasad commented that "while [it] was not a fatal mistake, physicians must be

very careful when prescribing these medications because of possible respiratory depression." (Nov. 5, 2014 Minutes at 3.) The board is the one to resolve any evidentiary conflicts regarding medical issues and is in the best position to do so. The trial court found the evidence meets the requisite legal standard and we cannot find that the trial court abused its discretion in so finding. Appellant's ninth assignment of error is overruled.

{¶ 53} By his tenth assignment of error, appellant contends that it was prejudicial error for the board to apply post-claim statutory changes and newly announced standards of care. Appellant's argument under this assignment of error is that "[a]ny standard of care espoused by Dr. Cicek is not practiced by any other doctor. If her standard of care is accepted, then Dr. Demint was unaware of it and due process is violated when a rule is created after the fact and applied to him." (Appellant's Brief at 48.)

{¶ 54} The board has promulgated rules for treating intractable pain with narcotics. *See* Ohio Adm.Code 4731-21-02. Dr. Cicek repeatedly testified regarding the standard of care. "[C]ourts must afford due deference to the board's interpretation of the technical and ethical requirements of its profession." *Pons* at 621. The reasoning behind this standard is that " ' "[T]he purpose of the General Assembly in providing for administrative hearings in particular fields was to facilitate such matters by placing the decision on facts with boards or commissions composed of [people] equipped with the necessary knowledge and experience pertaining to a particular field." ' " *Id.* at 621-22, quoting *Arlen* at 173, quoting *Farrand v. State Med. Bd.*, 151 Ohio St. 222, 224 (1949). Thus, the board is comprised of experts in the field of medicine and, therefore, the board is in the best position to determine whether a physician met the standard of care in the field of medicine. We cannot say the trial court abused its discretion in finding that the record contains evidence constituting substantial, reliable, and probative evidence. Appellant's tenth assignment of error is overruled.

{¶ 55} In his eleventh and twelfth assignments of error, appellant contends the basis of the board's decision was a new board member's comments that were inflammatory and mischaracterizations of the evidence and the board imposed vindictive punishment. Appellant argues that board members made improper comments not based on the evidence and then penalized him. In essence, appellant contends that "[t]he Board

silently found and punished a 'pill mill' specifically found not to exist."  (Appellant's Brief at 52.)

{¶ 56} Appellant complains that Dr. Soin's comments were inflammatory.   The November 5, 2014 board minutes contain statements attributed to Dr. Soin noting:

> [I]rregularities with Dr. Demint's practice, most notably that it was a cash-pay practice, visits cost $200.00, and patients had a 99% chance of being prescribed controlled substances. Dr. Soin stated that, according to a Medicare profile of physicians, 74% of pain management physicians wrote at least one prescription for a scheduled substance that year. Dr. Soin therefore found it very concerning that Dr. Demint, who was not a pain management physician, prescribed scheduled substances for 99% of his patients.

 (Nov. 5, 2014 Minutes at 4.)

{¶ 57} Dr. Soin's remarks were a restatement of the evidence.  Appellant testified that his practice only accepted cash and 99 percent of his patients received controlled substances.  When a board member restates appellant's own testimony, those comments cannot be construed as "highly prejudicial."  Dr. Soin also proposed the amendment to the hearing examiner's proposed order and commented that appellant "did not 'get it' when it comes to pain medications."  (Nov. 5, 2014 Minutes at 4.)  Dr. Soin believed appellant had the ability to offer good service to patients, but not in the field of pain management.  Dr. Soin utilized his own expertise to interpret the evidence and conclude that appellant should not be prescribing narcotics to patients.

{¶ 58} Mr. Giacalone agreed with Dr. Soin.   Mr. Giacalone commented that appellant was not operating a "pill mill" because "a typical 'pill mill' pattern would be to prescribe the same regiment for every patient, whereas Dr. Demint's prescriptions varied between patients."  (Nov. 5, 2014 Minutes at 15-16.)  Mr. Giacalone believed it was clear that appellant "overprescribed" and his "prescription habits do not necessarily fit within proper parameters."  (Nov. 5 2014 Minutes at 16.)  Mr. Giacalone expressed concern that given the "arrogance" of appellant's testimony and the "forthrightness of his convictions" appellant will return to his previous prescribing habits.  (Nov. 5, 2014 Minutes at 16.)  Mr. Giacalone supported Dr. Soin's amendment because it permanently prohibits appellant from prescribing narcotic analgesics.

{¶ 59} Here, the board members' expertise and the evidence formed the basis of their comments. All the board members had the benefit of the hearing examiner's report and, therefore, mitigated the danger of any one board member's comments unduly influencing the other board members. The board minutes set forth in some detail the factors and evidence in the record that the board considered exacerbating, leading to the modification of the order and penalty. Despite the fact that appellant does not agree with the result, the comments do not constitute reversible error.

{¶ 60} Appellant further argues that, upon remand, the board imposed an increased penalty and he has demonstrated actual vindictiveness on the board's part in penalizing him for exercising his right to an appeal, thereby denying him due process.

{¶ 61} On remand, the trial court tasked the board with considering the matter again. A trial court may remand for further proceedings, which means "that the case is returned to the administrative agency so that it may take further action in accordance with applicable law. Such a remand does not dismiss or terminate the administrative proceeding but, rather, means that the agency may take a fresh look at the matter." *Chapman v. Ohio State Dental Bd.*, 33 Ohio App.3d 324, 328 (9th Dist.1986), citing *Tucson v. Mills*, 114 Ariz. 107 (App.1976). The composition of the board had changed between the meetings. The board was not required to impose the same sanction.

{¶ 62} Furthermore, another aspect of the hearing may have influenced the board to impose a heavier penalty after remand. It is apparent from the minutes of the meeting that the board members found appellant arrogant during his testimony and appellant exhibited a disregard for the standards of care. Under the board's disciplinary guidelines, aggravating circumstances can include dishonest or selfish motive, a pattern of misconduct, multiple violations, refusal to acknowledge wrongful nature of conduct, and adverse impact and misconduct on others. The board minutes set forth the factors and evidence from the record that the board considered to be exacerbating, which led to the modification of the penalty.

{¶ 63} The board has the authority to impose a wide range of sanctions, pursuant to R.C. 4731.22, ranging from reprimand to revocation. The board has the authority to restrict a physician's license permanently. *Clark v. State Med. Bd. of Ohio*, 10th Dist. No. 14AP-212, 2015-Ohio-251. The court of common pleas, in concluding that the board's

order was supported by reliable, probative, and substantial evidence was precluded from modifying the penalty imposed if the penalty was authorized by law. *Henry's Cafe, Inc. v. Bd. of Liquor Control*, 170 Ohio St. 233 (1959), paragraphs two and three of the syllabus. The discretion granted to the board in imposing a wide range of potential sanctions reflects the deference due to the board's expertise in carrying out its statutorily granted authority over the medical profession.

{¶ 64} Moreover, there is no evidence that the board changed appellant's sanction for "vindictive" purposes. In *North Carolina v. Pearce*, 395 U.S. 711 (1969), the United States Supreme Court set aside the sentence of a prisoner who had successfully appealed his conviction but, on remand, a harsher sentence was imposed. The United States Supreme Court found that the prisoner's due process rights were violated when the harsher sentence was imposed after the successful appeal because of vindictiveness. The United States Supreme Court held that if a harsher sentence is imposed following appeal, the reasons for the harsher sentence must appear in the record and must be "based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding." *Id.* at 726. The United States Supreme Court clarified its holding in *Pearce* in *Wasman v. United States*, 468 U.S. 559 (1984). In *Wasman*, the United States Supreme Court held that harsher sentences on remand were not prohibited unless the enhancement was motivated by actual vindictiveness against the defendant as punishment for having exercised his rights. *Id.* at 568. In *Alabama v. Smith*, 490 U.S. 794 (1989), the United States Supreme Court further clarified *Pearce*, by holding that unless there was a "reasonable likelihood" that the increased sentence was the result of actual vindictiveness, the burden was on the defendant to show actual vindictiveness. *Id.* at 799.

{¶ 65} In this case, the board explained its reasoning for its actions and the reasons were based on the evidence. There is no evidence that the board was acting vindictively. The board acted within its authority when it issued the order. Based on this court's review of the administrative record, the trial court did not err in finding there was reliable, probative, and substantial evidence supporting the limitations and restrictions imposed by the board. Appellant's eleventh and twelfth assignments of error are overruled.

{¶ 66} For the foregoing reasons, appellant's twelve assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is affirmed.

*Judgment affirmed.*

DORRIAN, P.J., and SADLER, J., concur.